**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| THE OHIO CASUALTY INSURANCE COMPANY, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | )   Case No. 4:19-cv-2974-MTS ) |
| EAGLE MIST CORPORATION d/b/a OSAGI INTERNATIONAL, *et al.*, | ) ) ) ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

As presented to the Court, the key issue in this case is whether Plaintiffs, two insurance companies, are entitled to the reimbursement of defense costs they provided to Defendants. The Court held a one-day bench trial on this action. Plaintiffs' theory is that Defendants were not insureds under the insurance policy and because Plaintiffs assumed the defense of Defendants under a valid reservation of rights, that Plaintiffs are now entitled to recoup the total spent on the defense. Having considered each party's evidence, exhibits, and arguments of counsel, the Court enters this Memorandum Opinion with Findings of Fact and Conclusions of Law. As explained herein, the Court concludes Plaintiffs failed to show, by a preponderance of the evidence, Defendants' retention of benefits was unjust. Therefore, the Court will enter judgment in favor of Defendants.

**I.  Findings of Fact and Conclusions of Law**

   A. *Findings and Conclusions*

   1. Plaintiff Ohio Security Insurance Company ("Security") is an insurance company. Doc. [140] at 14 (14:15–20).

1

2. Plaintiff The Ohio Casualty Insurance Company ("Casualty") is an insurance company. *Id.*

3. Liberty Mutual Insurance Company ("Liberty Mutual")[1] is the parent company of Security and Casualty. *Id.* at 14 (14:15–20).

4. Security, not Casualty, paid the defense costs at issue in this case. *Id.* at 14 (14:21–24).

5. Security issued a commercial general liability policy of insurance (the "Policy") to Sapphire Bakery Company, LLC ("Sapphire"). Pl. Tr. Ex. 1.

6. Sapphire is the named insured in the Policy. Doc. [140] at 18 (18:14–16).

7. Under the Policy, the named insured can extend insurance coverage to "any person or organization," as an "additional insured," ("Additional Insured") by a "written contract or written agreement." *See* Pl. Tr. Ex. 1 at 165.

8. The "written contract or written agreement must be" "executed prior to the 'bodily injury,' 'property damage,' [or] 'personal advertising injury.'" *Id.*

9. Defendant Kevin Laughlin ("Laughlin") runs Defendant Eagle Mist Corporation d/b/a Osagai International ("Eagle Mist") (collectively, "Defendants"), which invents and formulates functional foods, such as protein shakes and nutrition bars. Doc. [140] at 49–50 (49:22–50:3).

10. A company named Defense Nutrition, LLC ("Defense Nutrition") asked Laughlin to reformulate a nutrition bar line. *Id.* at 51–52 (51:21–52:1).

11. Laughlin, in turn, reached out to Sapphire to manufacture the bars. *Id.* at 51 (51:11–16).

12. Eagle Mist and Sapphire executed a written agreement titled Mutual Non-Disclosure and Non-Circumvention Agreement (the "NDA"). Pl. Tr. Ex. 15.

13. Before beginning any production, Laughlin sought insurance coverage, as is required by the industry. Doc. [140] at 52 (52:8–20).

14. In doing so, Laughlin emailed the CEO of Sapphire and asked that Eagle Mist be added as Additional Insureds under the Policy. Pl. Tr. Ex. 4 at 3; Doc. [140] at 52–53 (52:21–53:21).

15. In response, Sapphire emailed Mara Raglin, a broker at Martin Gallaher Insurance Group ("Gallaher"), who was Plaintiffs' insurance broker, requesting a certificate of insurance for Eagle Mist. Pl. Tr. Ex. 5 at 1–2; Doc. [140] at 54–55 (54:2–55:2).

---

[1] For purposes of this Memorandum Opinion, the Court refers to any actions of Liberty Mutual as the acts of "Plaintiffs."

16. Sapphire, through Gallaher, provided Eagle Mist its own personal certificate of liability insurance (the "COI"). Pl. Tr. Ex. 5 at 5-004; Doc. [140] at 54–55 (54:2–55:2).

17. Laughlin testified he believed the COI was valid and conferred coverage under the Policy because the certificates were known to Laughlin from prior business dealings and what he knew to be standard in the industry. Doc. [140] at 55 (55:7–23), 64 (64:11–14).

18. Laughlin reasonably believed Defendants were covered under the Policy after receiving the COI and based on written communications between him, Sapphire, and Gallaher.

19. Only after receiving the certificate did Laughlin begin producing the nutrition bars with Sapphire. Doc. [140] at 52 (52:8–23), 55–56 (55:24–56:1).

20. In August of 2016, Defense Nutrition filed a lawsuit ("Underlying Lawsuit") against Defendants and Sapphire regarding the nutrition bars. *Id.* at 56 (56:2–11).

21. Laughlin immediately contacted Plaintiffs to confirm coverage under the Policy. *See id.* at 56–57 (56:22–57:10).

22. In October 2016, Plaintiffs confirmed they would help Defendants with a defense and Defendants tendered the Underlying Lawsuit to Plaintiffs. Doc. [140] at 58 (58:1–8).

23. Sometime in 2016, Plaintiffs conducted an investigation with respect to coverage of Defendants and, specifically, with respect to whether Defendants were Additional Insureds under the Policy. *Id.* at 33–34 (33:7–34:4).

24. As part of the investigation, Plaintiffs received email communications, the COI, the NDA, and purchase orders between Eagle Mist and Sapphire. *Id.* at 20 (20:12–17); *see also* Pl. Tr. Ex. 12 at 003, 027–028, 062.

25. The NDA did not require Sapphire to add Defendants as Additional Insureds on the Policy. *See* Pl. Tr. Ex. 15; Doc. [140] at 23 (23:22–24:2).

26. The purchase orders did not require Sapphire to add Defendants as Additional Insureds on the Policy. *See* Pl. Tr. Ex. 16; Doc. [140] at 24 (24:8–11).

27. The COI did not require Sapphire to add Defendants as Additional Insureds on the Policy. *See* Pl. Tr. Ex. 5; Doc. [140] at 21–23 (21:9–23:11).

28. There was no written contract or agreement requiring Sapphire to name Defendants as Additional Insureds on the Policy. Doc. [140] at 24 (24:12–16).

29. After investigating in 2016, Plaintiffs agreed to cover Defendants' legal fees for the Underlying Lawsuit. Doc. [140] at 34 (34:5–8).

3

30. In a letter dated March 2017, Plaintiffs stated their defense of Defendants in the Underlying Lawsuit was "subject to a reservation of all rights." Pl. Tr. Ex. 12 at 001.

31. Plaintiffs sent Defendants coverage letters including similar language and reserving the same rights on November 29, 2018, and November 8, 2019. Pl. Tr. Ex. 12 at 025; Tr. Ex. 12 at 059.

32. Plaintiffs paid all of Defendants' legal bills as the lawsuits progressed in 2016, 2017, 2018, and 2019. Doc. [140] at 73 (73:9–15).

33. Plaintiffs handled the billing and payment for Defendants' legal counsel and Laughlin was not involved. Doc. [140] at 59–60 (59:18–60:21).

34. Laughlin reasonably believed Defendants were covered under the Policy based on Plaintiffs' conduct.

35. The Underlying Lawsuit was set to begin trial on December 9, 2019. Pl. Tr. Ex. 12 at 059.

36. At some point in 2019, Plaintiffs concluded Defendants were never covered under the Policy, *id.* at 34–41 (34:5–41:9), and one month before trial would begin in the Underlying Lawsuit, Plaintiffs filed an action requesting a declaratory judgment from this Court stating Plaintiffs no longer had a duty to defend Defendants in the Underlying Lawsuit, Doc. [1].

37. From 2016 to 2019, Plaintiffs provided no statement, conclusion, or notice to Defendants that they were not covered under the Policy.

38. Kimberly Chong, a senior claims examiner for Liberty Mutual, testified for the Plaintiffs. Doc. [140] at 13 (13:8–12).

39. Ms. Chong was assigned to Defendants' case in June 2019 as the claims representative. *Id.* at 14 (14:7–10), 16 (16:5–8).

40. Ms. Chong testified that the decision of Defendants' coverage status was reached in 2019 exclusively as a result of privileged communications with Plaintiffs' lawyers. *Id.* at 39–41 (39:9–41:9).

41. Ms. Chong testified that the Policy and evidence that formed the basis of Plaintiffs' coverage position had not changed from 2016 to 2019. *Id.* at 40 (40:6–11).

42. The Court does not find credible Ms. Chong's testimony that between the initial coverage position where Plaintiffs agreed to pay for defense costs and 2019 when it decided not to pay, that Plaintiffs never made a "definitive conclusion" that Defendants were not covered under the Policy. *Id.* at 35 (35:7–14).

43. Plaintiffs knew in 2016 that Defendants were not covered under the Policy.

4

44. Plaintiffs provided no evidence that their more than three-year delay in asserting their coverage position in 2019 was reasonable or in good faith.

45. Defendants provided evidence that Plaintiffs' decision to disclaim coverage in 2019 may have been for improper purposes.

46. On October 4, 2021, the Court granted Plaintiffs' request for a declaratory judgment based on its finding that Plaintiffs did not have an ongoing duty to defend Defendants in the Underlying Lawsuit because the remaining *claims* in the Underlying Lawsuit were not covered under the Policy.  Doc. [67].

47. In a letter dated October 6, 2021, Plaintiffs notified Defendants "effective immediately [Plaintiffs] are withdrawing their defense under a reservation of rights that had been previously provided to" Defendants for several reasons, including that Defendants were never Additional Insureds under the Policy.  *See* Pl. Tr. Ex. 13; Doc. [140] at 61 (61:2–16).

48. Security paid $846,745.81 in defense costs on behalf of Defendants from September 1, 2016, to August 25, 2021.  *See* Pl. Tr. Ex. 7A, 7B, & 7C.

B. ***Defendants Were Not Additional Insureds Under The Policy***

The first issue is whether Defendants were insured under the Policy.  Plaintiffs argue Defendants were *never* Additional Insureds under the Policy.  The Court concludes that based on the evidence presented at trial, Defendants were not covered under the Policy.

Security issued the Policy to Sapphire, the named insured, and the Policy itself nowhere states Eagle Mist or Laughlin is a named insured.  Thus, the only way Defendants would be insureds under the Policy is if they were Additional Insureds.[2]  This point is not disputed.

Plaintiffs point to the plain language of the Policy to support their argument that Defendants were *never* covered under the Policy.  The Policy states that if Sapphire wanted to extend insurance coverage under the Policy to "any person or organization," like Defendants, Sapphire was "required to name as an additional insured on this policy under a written contract or

---

[2] This case went to trial because "the record show[ed] a genuine dispute over whether several communications between Defendants, Defendants' agents, Plaintiff[s], and Sapphire were sufficient to add Defendants as 'additional insureds' under Sapphire's policies."  *Ohio Cas. Ins. Co. v. Eagle Mist Corp.*, 4:19-cv-2974-MTS, 2021 WL 4523146, at *8 (E.D. Mo. Oct. 4, 2021) (denying Plaintiffs' Motion for Summary Judgment on their unjust enrichment claim).

5

written agreement." *See* Pl. Tr. Ex. 1 at 165. The Policy further states that the "written contract or agreement" must be "executed" prior to the injury or damage that forms the basis of insurance coverage. *Id.*

At trial, Plaintiffs presented evidence on the absence of any "executed" written agreement requiring Sapphire to name Defendants as Additional Insureds on the Policy. Plaintiffs pointed to the NDA, signed by both Sapphire and Plaintiffs, which did not mention insurance coverage. *See* Pl. Tr. Ex. 15. Plaintiffs next questioned Ms. Chong about the two purchase orders Eagle Mist issued to Sapphire, and Ms. Chong explained those agreements too were silent as to insurance coverage. *See* Pl. Tr. Ex. 16; Doc. [140] at 24 (24:3–11). Plaintiffs next introduced evidence on email negotiations between Sapphire and Eagle Mist concerning insurance coverage issues and asked Ms. Chong whether the written communications included any language requiring Sapphire to name Laughlin as an Additional Insured under the Policy, to which Ms. Chong responded "[n]o, there is not such language." Doc. [140] at 21 (21:4–8). Finally, Plaintiffs pointed to the COI and Ms. Chong explained the COI was insufficient to confer insurance coverage to Eagle Mist. *See* Pl. Tr. Ex. 5; Doc. [140] at 21–23 (21:9–23:11). Ms. Chong explained that the purpose of a COI is to provide the certificate holder notice of cancellation in the event the policy cancels prior to its expiration date. Doc. [140] at 21–22 (21:23–22:1). Ms. Chong also read portions of the COI that stated the COI "confers no rights upon the certificate holder, "does not affirmatively or negatively amend, extend or alter the coverage," and "does not constitute a contract." *Id.* at 22–23 (22:12–23:9).

The Court concludes that based on the evidence presented by Plaintiffs at trial, Plaintiffs proved that under the plain meaning of the Policy, there was no written or "executed" agreement

that required Sapphire to name Eagle Mist or Laughlin as an Additional Insured, as is necessary for coverage under the Policy.

### C. *Defendants' Retention of Benefits Under the Circumstances Here Are Not Unjust*

For the same reasons the Court agrees with Plaintiffs that Defendants were not Additional Insureds under the Policy, the Court finds Plaintiffs are not entitled to recovery under a theory of unjust enrichment. Plaintiffs argue that because Defendants were never covered under the Policy, Security is entitled to recover all expenses it paid for Defendants' defense. The Court does not agree.

The elements of a claim for unjust enrichment are: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of the benefit; and (3) acceptance and retention by the defendant of that benefit under circumstances in which retention without payment would be inequitable. *Aughenbaugh v. Williams*, 569 S.W.3d 514, 527 (Mo. Ct. App. 2018). "Even if a benefit is 'conferred' and 'appreciated,' if no injustice results from the defendant's retention of the benefit, then no cause of action for unjust enrichment will lie." *Howard v. Turnbull,* 316 S.W.3d 431, 436 (Mo. Ct. App. 2010); *Mo. Pub. Entity Risk Mgmt. Fund ("MOPERM") v. Am. Cas. Co. of Reading*, 399 S.W.3d 68, 78 (Mo. Ct. App. 2013) ("Mere receipt of benefits is not necessarily a basis for [unjust enrichment] if the court does not find [the recipient] unjustly enriched."); *Green Quarries, Inc. v. Raasch*, 676 S.W.2d 261, 264 (Mo. Ct. App. 1984) ("The most significant requirement is that the enrichment to the defendant be unjust."). "In determining whether it would be unjust to permit the enriched party to retain benefits, 'the court uses equitable principles in considering the various factors surrounding the relationship such as change of position, hardship, unreasonable delay, unclean hands, bad faith and other equitable principles of defense.'" *MOPERM*, 399 S.W.3d at 78 (quoting *Farmers New World Life Ins. Co.,*

7

*Inc. v. Jolley*, 747 S.W.2d 704, 705 (Mo. Ct. App. 1988)). Considering equitable principles under the circumstances here, the Court does not find it unjust for Defendants to retain the benefits of the legal expenses paid by Plaintiffs.

Evidence shows Plaintiffs knew as early as 2016 that Defendants were not covered under the Policy. In 2016, upon assuming the defense of Defendants, Plaintiffs investigated whether Defendants were Additional Insureds under the Policy. As part of the investigation, Plaintiffs received email communications, the COI, the NDA, and purchase orders between Eagle Mist and Sapphire (the "documents"). Ms. Chong testified that none of those documents were sufficient to name Defendants as Additional Insureds based on the plain language of the Policy. Ms. Chong conceded the Policy and documents did not change from the time Plaintiffs assumed defense of Defendants in 2016 to the time Plaintiffs disclaimed coverage of Defendants in 2019. Despite their *own* admissions that Defendants were not Additional Insureds based on the documents and Policy reviewed *in 2016*, Plaintiffs continued to pay Defendants' legal costs in 2016, 2017, 2018, and 2019 without issue.

Ignoring their own conduct, Plaintiffs now assert they are entitled to recoup the full amount of defense costs they paid on behalf of Defendants under a theory of unjust enrichment. Plaintiffs make this request despite their failure to offer any evidence that retention of benefits in a situation like here was unjust—i.e.: that Defendants' acceptance of Plaintiffs' defense was unjust. *See, e.g.*, *W. Cas. & Sur. Co. v. Kohm*, 638 S.W.2d 798, 800–01 (Mo. Ct. App. 1982) (ordering equitable return of money where "defendant knew that he had no right to the money from the moment he received it" because defendant knew he was not covered under the insurance policy). To the contrary, Defendants put forth evidence that their retention of benefits *was* just. Notably, Defendants had a good faith basis to believe they were Additional Insureds under the Policy.

8

Laughlin reasonably believed the COI was valid and conferred coverage.  Several written and verbal communications between Laughlin/Sapphire, Laughlin/Plaintiffs, and Laughlin/Liberty Mutual show the same.  The Court also notes that a single mention in a twenty-five-plus-page boilerplate reservation of rights letter, without any further action by Plaintiffs for *three years*, was insufficient to put Defendants on notice they might not be covered under the Policy.

With this claim, Plaintiffs ask the Court to blink away evidence of Plaintiffs' *own* conduct—conduct the Court finds also provided Defendants a reasonable basis to believe they were covered under the Policy.  Plaintiffs assumed defense and investigated their coverage position in 2016 (notably, based on the *same* Policy and *same* documents reviewed in 2019 relied on to disclaim coverage), Plaintiffs sent Defendants coverage letters in 2017, 2018, and 2019, and Plaintiffs continuously paid Defendants' legal fees over a three-year period.  Plaintiffs had the ability to investigate whether Defendants were covered under their *own* Policy and to clarify their coverage position to Defendants.  Instead of doing so, *for more than three years*, Plaintiffs did not notify Defendants of their lack of coverage, Plaintiffs paid Defendants' legal bills without involving Defendants, and Plaintiffs continued to defend Defendants' without so much as a peep[3] of this potential coverage issue.  Plaintiffs offered no evidence to justify, what the Court considers, inconsistent conduct.

What is more, Plaintiffs would have the Court believe they first discovered Defendants were not covered in 2019.  The only evidence Plaintiffs offered to justify their coverage decision in 2019 were the documents and Policy.  But undisputed evidence shows Plaintiffs determined in 2019 Defendants were *never* covered under the Policy based on the *same* Policy and the *same*

---

[3] As the Court explained in this Memorandum Opinion, the single mention of the *possibility* of no coverage in a lengthy boilerplate reservation of rights letters was insufficient to impute notice on Defendants that they might not be covered under the Policy given Plaintiffs' conduct for more than three years and Laughlin's reasonable belief Defendants were covered.

9

documents Plaintiffs reviewed when they decided *to cover* Defendants in 2016.  The Court does not find it credible Plaintiffs first learned Defendants were not covered by the Policy in 2019. Plaintiffs had the evidence in 2016 to come to this conclusion but instead waited years.  Why? Plaintiffs offered no evidence at trial to answer this determinative question.

Plaintiffs submitted *no* evidence regarding their reasons for the delayed coverage decision in 2019.  In fact, when defense counsel inquired into this issue, Plaintiffs refused to answer based on attorney-client privilege.  While the Court does not draw any adverse inferences from the invocation of the privilege, the Court notes that nothing on this record demonstrates retention of the benefits under these circumstances are unjust.  Rather, the evidence here shows, undisputedly, Plaintiffs belatedly asserted their coverage position when they previously knew of their lack of coverage and took no steps to enforce their coverage position until Defendants would be, in good faith, most disadvantaged by Plaintiffs' change in position.

Plaintiffs' failure to provide evidence concerning their coverage decision is especially pronounced here given that Defendants offered evidence that Plaintiffs' decision to disclaim coverage in 2019 may have been for nefarious purposes.  While the Court stops short of granting Defendants' unclean hands defense,[4] the Court notes that Defendants, at the very least, offered testimony that Plaintiffs' change in coverage position was "strategic" and the result of privileged communications with lawyers.  Credibility is at the forefront of this matter.  *See, e.g.*, *Day v. Hupp*, 528 S.W.3d 400 (Mo. Ct. App. 2017) (explaining cases involving claims for restitution based on unjust enrichment usually turn on questions of credibility).  Plaintiffs provided no evidence their

---

[4] The Court does not address Defendants' equitable defenses of unclean hands or equitable estoppel because the Court concludes Plaintiffs are not entitled to recovery under a theory of unjust enrichment.  The Court notes, however, that Defendants produced strong evidence of both at trial.

*three-year delay* in asserting their coverage position was justified or for reasons other than the improper ones Defendants suggest.

Plaintiffs essentially buried their head in the sand and ask the Court to claw back funds they voluntarily paid over a span of years without producing any evidence that Defendants acted unjustly or that a three-year delay in asserting their coverage position was justified or reasonable. Despite such approach being immensely unpersuasive, it is insufficient to meet *their* burden. *White v. Pruiett*, 39 S.W.3d 857, 863 (Mo. Ct. App. 2001) (explaining a *plaintiff* must prove the benefit "would be unjust for one party to retain"); *Day v. Hupp*, 528 S.W.3d 400, 417 (Mo. Ct. App. 2017) ("Mere receipt of a benefit is not enough to establish unjust enrichment absent a showing that it would be unjust for the defendant to retain the benefit.").

Plaintiffs' unjust enrichment claim has no basis in law, either. Plaintiffs point to no precedent that retention of benefits in a situation like here is unjust. In fact, Missouri courts have not addressed whether an insurer may recoup defense costs in the absence of coverage—such as here, where the complaining party voluntarily provided a defense to an insured for several years. Indeed, Plaintiffs point to no cases, and the Court can find none, in *any other jurisdiction* that support their position.[5] While there are no unjust enrichment cases based on similar facts as to this case, the Court notes, tellingly, the cases with similar facts to the facts here are ones where courts find bad faith on the part of the insurer.[6]

---

[5] The Court notes a split amongst the courts regarding whether an insurer can recoup defense costs incurred in defending non-covered claims. That law, however, is distinguishable because Plaintiffs do not argue Security incurred defense costs for *claims* potentially not covered by the Policy, but rather, that Security incurred defense costs for a *party* not covered by the Policy.

[6] The Court acknowledges that bad faith is distinct from a claim for unjust enrichment and that Missouri does not recognize a claim for bad faith under the circumstances here. *Ohio Cas. Ins. Co. v. Eagle Mist Corp.*, 4:19-cv-2974-MTS, 2021 WL 6062520, at *2–3 (E.D. Mo. Dec. 22, 2021) (granting summary judgment in favor of Plaintiffs on Defendants' bad faith claim solely because Missouri law does not recognize the claim standing alone but mentioning other states do recognize the claim under similar circumstances to the ones in this case); *see, e.g., id.* at *n.9 (citing *Pozzi Window Co. v. Auto-Owners Ins.*, 446 F.3d 1178, 1188 (11th Cir. 2006) (explaining factors Florida courts

In conclusion, Plaintiffs have not persuaded the Court that Defendants' retention of the benefits under the circumstances here—Plaintiffs' voluntary assumption of Defendants' defense, ongoing knowledge Defendants were not covered under the Policy, continuous payment of defense costs, and a three-year delayed decision to deny coverage—is unjust.

## II. Conclusions of Law

The Court concludes that the evidence Plaintiffs adduced did not prove, by a preponderance of the evidence, that Defendants' retention of benefits here was unjust. Accordingly, the Court will enter a judgment in favor of Defendants, which will accompany this Memorandum Opinion. *See* Fed. R. Civ. P. 52, 58.

Dated this 16th day of December, 2022.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE

---

identify as relevant to a bad-faith claim against an insurer is an insurer's efforts to resolve the coverage dispute promptly or in such a way as to limit any potential prejudice to the insureds and the insurer's diligence and thoroughness in investigating the facts specifically pertinent to coverage)).